| | |
|---|---|
| ABSEN, INC., a Delaware corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) **Case No. 6:19-cv-00905-PGB-LRH** |
| LED CAPITAL, LLC, a New Jersey | ) |
| limited liability company; and MARCEL | ) |
| DEKEYZER, an individual, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | / |

## PLAINTIFF'S RENEWED MOTION FOR DEFAULT JUDGMENT

Pursuant to Federal Rule of Civil Procedure 55(b)(2), Plaintiff Absen Inc. ("Absen") files a renewed motion for default judgment against Defendants LED Capital, LLC ("LED Capital") and Marcel Dekeyzer (together, "Defendants").

## INTRODUCTION

Absen filed this case in May 2019 to recover for Defendants' breach of two notes and a guaranty, to enforce a security agreement, and to foreclose on two liens on personal property (D.E. 1, 8). Defendants stopped making payments on the notes in September 2018. In response, Absen accelerated the over $5 million that remained due and twice demanded payment in writing (D.E. 8-7, 8-8). To date, Defendants have failed to pay the full amount due. In fact, despite receiving service of process (D.E. 11, 12), Defendants have not even appeared, filed a responsive pleading, or otherwise defended this case, even after the Clerk of Court entered a default against them (D.E. 14). Thus, in July 2019, Absen moved for default judgment (D.E. 15).

In November 2019, the Court entered a Supplemental Briefing Order, requiring Absen to provide more details about how it calculated outstanding principal and interest, and to seek

attorneys' fees and costs now instead of later (D.E. 16). In response, Absen submitted a Supplemental Memorandum in Support of the Motion for Default Judgment (D.E. 17).

Thereafter, the Court denied Absen's motion without prejudice, requiring Absen to address several additional issues in a renewed motion for default judgment (D.E. 18). In particular, the Court ordered Absen to address: (1) "whether New Jersey or Florida law applies to each count of the amended complaint (in particular Count V through Count VI);" (2) "the propriety of Plaintiff's request that this Court order the subject collateral seized and sold according to law;" (3) "the collateral that it is asking that the Court Order be seized;" (4) "the reasonableness of the requested [attorneys'] fees in the Central Florida community;" and (5) "the number of hours worked by each attorney in this matter" (*id.* at 3–8).

As a means to resolve many of these issues, Absen has filed a Second Amended Complaint, which no longer asserts Counts V or VI for foreclosure (D.E. 27); and will no longer seek attorneys' fees or costs. The remaining issues are addressed below. Absen requests that the Court enter a default judgment: (1) awarding Defendants monetary damages consisting of the principal outstanding on the notes with default interest; and (2) recognizing Absen's perfected security interest in the collateral identified in two UCC financing statements.

## BACKGROUND

### I.    Loan Documents

In late 2017, Absen lent LED Capital $6,651,810.00 to purchase over 3,000 LED tiles and various accessories from Absen. In connection with this loan, Absen, LED Capital, and Dekeyzer executed several documents, which are summarized below.

A.    <u>**First Note Receivable**</u>

On August 3, 2017, LED Capital executed a note receivable agreement in favor of Absen for $3,746,810.00 ("First Note Receivable"), requiring LED Capital to make monthly payments, from August 2017 through May 2020, as set forth in a payment schedule (D.E. 8 at ¶¶ 10, 19; 8-1 at 3–4, Ex. A). The First Note Receivable permits Absen to accelerate the "principal sum" together with "accrued interest," if an event of default occurs, and sets forth several events of default, including the failure to make a monthly payment, which is not cured within five days of written notice (D.E. 8-1 at 4–5). Upon an event of default, LED Capital agreed to pay default interest of twelve percent per annum on the principal outstanding (*id.* at 2, 5); and "all costs of collecting, securing or attempting to collect or secure this Agreement, including without limitation, court costs and Attorneys' Fees" (*id.* at 5).

As to the amount due, LED Capital agreed that "there are no defenses, equities or setoffs with respect to [its] obligations" and waived "[d]emand, presentment, notice of dishonor, notice of nonpayment, suit against any party, diligence in collection, and all other requirements necessary to enforce this Agreement" (*id.* at 6–7). In addition, LED Capital agreed that "Absen shall not by any act, delay, omission, or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by Absen" (*id.*).

As to remedies, LED Capital agreed that "[a]ll rights and remedies of Absen under the terms of this Agreement and applicable statutes or rules of law shall be cumulative, and may be exercised successively or concurrently" (*id.*). In addition, LED Capital agreed that Florida law governed, consented to the jurisdiction of this Court, and confirmed that the First Note Receivable constituted sufficient minimum contacts of LED Capital with Florida (*id.*).

### B.    <u>Security Agreement</u>

In connection with the First Note Receivable, LED Capital executed a Security

Agreement, granting Absen a continuing, first-priority lien in Collateral, defined as:

> (A)    "1,800 Absen M2.9 mobile LED tiles and 448 Absen X3v mobile LED
> tiles with control system and accessories packed in flight cases . . . together with
> all replacements therefor, additions and accessories thereto, and proceeds,
> whether now owned or hereafter acquired (including, but without limitation,
> insurance proceeds) and products thereof, including, without limitation, all
> Accounts; Chattel Paper; Commercial Tort Claims; Documents; General
> Intangibles; Instruments; Intellectual Property Rights; Investment Property;
> Payment Intangibles; Supporting Obligations arising from or related to the
> Equipment;" and

> (B)    "[t]he Membership Interests," which is defined as "the present and future
> membership interests (or other ownership or profit interests in) [LED Capital], all
> of the warrants, options or other rights for the purchase or acquisition from [LED
> Capital] of membership interests (or other ownership or profit interest in) [LED
> Capital], all securities convertible into or exchangeable for membership interests
> (or other ownership or profit interests in) [LED Capital] or warrants, rights or
> options for the purchase or acquisition from [LED Capital] of such membership
> interests (or such other interests), and all of the other ownership or profit interests
> in [LED Capital] (including member or trust interests therein), whether voting or
> nonvonting, and whether or not such membership interests, warrants, options,
> rights or other interests are outstanding on any dates of determination, in each
> such case including all voting rights and economic rights related thereto"

("First Lien") (D.E. 8 at ¶ 11, 12; 8-2 at 1–2, 7–9).  The First Lien secured all debts of LED

Capital, including future debts and attorneys' fees incurred in connection with enforcing the

security interest and collecting the collateral using litigation (D.E. 8-2 at 2).  In addition, as

further protection, LED Capital agreed to covenants, in which it promised to defend, maintain,

and preserve the First Lien; and to not sell, transfer, assign, encumber, or restrict any of the

collateral, without prior written consent from Absen (*id.* at 3).

Upon an event of default, LED Capital agreed that Absen could, without notice or

demand, "assert all rights and remedies of a secured party under the UCC or other applicable

law," including the right to "take possession of, hold, collect, sell, lease, deliver, grant options to

purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral" (*id.* at 6). In such circumstances, LED Capital agreed, at its own expense, "to do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding in compliance with applicable law" (*id.* at 7). In addition, LED Capital agreed that Absen shall not waive any right or remedy by any act or omission, unless in writing; that "[a]ll rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law;" and that Florida law governed (*id.* at 9).

## C.      Guaranty

Also in connection with the First Note Receivable, Dekeyzer executed a Guaranty in favor of Absen, "absolutely and unconditionally guarantee[ing] to Absen the due, regular, and punctual payment and prompt performance of all of the Obligations including, but not limited to, the payment of all amounts owing under the Agreement and all Default Costs and Indemnified Losses in connection therewith" (D.E. 8 at ¶ 14; 8-4 at 1). "Default Costs" and "Indemnified Losses" include "all damages, dues, penalties, fines, costs, amounts paid in settlement, taxes, losses, expenses, and fees, including court costs and Attorneys' Fees and expenses" incurred because of an event of default (D.E. 8-1 at 2).

As to relief, Dekeyzer agreed that Absen is not required to assert a claim against LED Capital or "to pursue or foreclose on any collateral" before asserting a claim against Dekeyzer; and that Absen, in its sole discretion, may apply payments to other debts, aside from the First Note Receivable (D.E. 8-4 at 1, 3). In addition, Dekeyzer agreed that Florida law governed and consented to the jurisdiction of this Court (*id.*).

**D.**     **Second Note Receivable**

On November 9, 2017, LED Capital executed another note receivable agreement in favor of Absen, this time for $2,905,000.00 ("Second Note Receivable"), requiring LED Capital to make monthly payments, from April 2018 through April 2021, as set forth in a payment schedule (D.E. 8 at ¶¶ 15, 19; 8-5 at 1, Ex. A).  The Second Note Receivable permits Absen to accelerate the "principal sum" together with "accrued interest," if an event of default occurs, and sets forth several events of default, including the failure to make a monthly payment, which is not cured within five days of written notice (D.E. 8-5 at 2–3).  Upon an event of default, LED Capital agreed to pay default interest of twelve percent per annum on the principal outstanding (*id.* at 3, 6); and "all costs of collecting, securing or attempting to collect or secure this Agreement, including without limitation, court costs and Attorneys' Fees" (*id.* at 3).

As to the amount due, LED Capital waived "[a]ll rights of exemption of property from levy or sale under execution or other process for the collection of debts;" and "[d]emand, presentment, notice of dishonor, notice of nonpayment, suit against any party, diligence in collection, and all other requirements necessary to enforce this Agreement" (*id.* at 4).  As security, LED Capital granted Absen a continuing lien in additional Collateral, defined as:

> [A]ll right, title and interest of [LED Capital] in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired: (i) 1,008 Viss VX5 Plus LED tiles featuring 5.7 mm pixel pitch, 60 cm by 120 cm frame size, and white SMD2727, with NovaStar control system and accessories . . . together with all replacements therefor, additions and accessions thereto; (ii) all accounts; chattel paper; general tangibles, goods, equipment, inventory payment intangibles and other assets of [LED Capital], whether no owned or hereafter acquired; and (iii) all proceeds (including, but without limitation, insurance proceeds) of any of the foregoing

("Second Lien") (D.E. 8-5 at 7).  In addition, the Second Note Receivable included an "Equipment List" defining some of the collateral more specifically as follows:

| Item | Description | Unit | Quantity |
|------|-------------|------|----------|
| LED Display Panel | VX5 Plus LED panel, 5.7mm pixel pitch, 60* 120 cm, White SMB2727 | PCS | 1008 |
| Video Controller | NovaStar MCTRL 660 Video Controller | PCS | 15 |
| Dolly | 8 Panels Per Dolly | SET | 126 |
| Hanging Bar | Hanging Bars – 1.2m | SET | 150 |
| Power Cable | Neutrik PowerCON – 5m, power | PCS | 300 |
| Data Cable | Neutrik etherCON RJ45 – 20/30m, data | PCS | 30 |
| Jumper Cable-Data | DataCON – 0.35m, data*coupler | PCS | 200 |
| Jumper Cable-Data | Neutrik etherCON – 0.85m, Data | PCS | 200 |
| Flight Case | Flight Case for Accessories | PCS | 15 |
| Spare Parts (*Suggested*) | Power Supply | PCS | 40 |
| | Receiving Card | PCS | 40 |
| | LED Module | PCS | 100 |
| | Complete Power Box | PCS | 30 |
| | | | |
| Spare Parts (*Free*) | SMD2727 White Face/Black | PCS | 35000 |

| | | |
|---|---|---|
| Body | | |
| IC | PCS | 700 |
| Power Supply | PCS | 40 |
| Receiving Card | PCS | 40 |
| LED Module | PCS | 60 |
| Complete Power Box | PCS | 20 |
| Mask | PCS | 2000 |

(*id.* at 13, Ex. B).

The Second Lien secured "the payment and performance of the Obligations" (*id.* at 1). Upon an event of default, LED Capital agreed that "Absen shall have all remedies under law or in equity, including all remedies under Article 9 of the Uniform Commercial Code," such as the right to take possession of, liquidate or dispose of all or any portion of the additional Collateral (*id.*). Finally, LED Capital again agreed that Florida law governed, consented to the jurisdiction of this Court, and confirmed that the Second Note Receivable constituted sufficient minimum contacts of LED Capital with Florida (*id.* at 4).

**E.   UCC Financing Statements**

To perfect the First and Second Liens, Absen recorded two UCC Financing Statements with the State of New Jersey, Department of the Treasury, Division of Revenue & Enterprise Services, UCC Section: (1) Filing Number 5238756 for the First Lien (D.E. 8-3); and Filing Number 52502271 for the Second Lien (D.E. 8-6). The UCC Financing Statements include the same descriptions of the collateral as those in the Security Agreement and Second Note Receivable (D.E. 8-3; 8-6).

## II.    LED Capital's Default

In September 2018, LED Capital failed to make the monthly payment due pursuant to the First and Second Notes Receivable (D.E. 8 at ¶ 20, 26).  In January and February 2019, Absen twice demanded, in writing and by certified mail, that LED Capital cure the default and pay all outstanding amounts due (*id.* at ¶¶ 21, 23; 8-7; 8-8).  But LED Capital did not comply with the demand or cure the default (D.E. 8 at ¶ 22, 24).  As such, when the five-day cure period of the second demand letter expired on February 20, 2019, Absen accelerated the First and Second Notes Receivable (D.E. 8 at ¶ 26).  Thus, the full amount of principal outstanding immediately became due and began accruing interest at the default rate of twelve percent per annum (D.E. 8-1 at 2, 5; 8-5 at 2–3, 6).  Although not required, Absen provided written notice of LED Capital's default to LED Capital and Dezeyzer by hand delivery (D.E. 8-9).

After default and acceleration of the notes, LED Capital made six payments to Absen: (1) $45,000 on May 9, 2019; (2) $90,000 on August 1, 2019; (3) $10,000 on August 2, 2019; (4) $50,000 on September 20, 2019; (5) $75,000 on October 31, 2019; and (6) $40,000 on December 4, 2019 (Ex. D at ¶ 8).  These payments, which occurred well after default and acceleration, total $310,000 (*id.*).  No other payment has been received (*id.*).  Dekeyzer is not a member of the uniformed services.  *See* Affidavit in Compliance with the Servicemembers Civil Relief Act, attached as **Exhibit A**.

## ARGUMENT

## I.    The Court Should Enter Default Judgment Against Defendants

"When a defendant has failed to plead or defend, a district court may enter judgment by default."  *Surtain v. Hamlin Terrace Found.*, 789 F. 3d 1239, 1244 (11th Cir. 2015) (citing Fed. R. Civ. P. 55(b)(2)).  As defaulting defendants, LED Capital and Dekeyzer are automatically

deemed to admit the well-pleaded allegations of the Complaint. *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009). Thus, liability is established to the extent the allegations, if accepted as true, "state a claim for relief that is plausible on its face." *Surtain*, 789 F. 3d at 1245. "This plausibility standard is met 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (interpreting standard "as being akin to that necessary to survive a motion to dismiss for failure to state a claim").

"Once liability is established, the court turns to the issue of relief." *Enpat, Inc. v. Budnic*, 773 F. Supp. 2d 1311, 1313 (M.D. Fla. 2011). "Although a defaulted defendant admits well-pleaded allegations of liability, allegations relating to the amount of damages are not admitted by virtue of default." *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999). Instead, the Court must determine "the amount and character of damages to be awarded," which "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." *Id.* Determining damages, however, does not require an evidentiary hearing when damages are discernable from documentary evidence or affidavits. *First Home Bank v. Polymathic LLC*, No. 8:17-cv-1568-CEH-JSS, 2017 U.S. Dist. LEXIS 195218, at *1–2 (M.D. Fla. Nov. 8, 2017) (recommending default judgment in case involving enforcement of promissory notes), adopted by 2017 U.S. Dist. LEXIS 194680 (M.D. Fla. Nov. 28, 2017).

### A.      Each Count of the Second Amended Complaint States a Claim

Where the Court's jurisdiction is based on diversity of citizenship, the Court "must apply the choice of law rules of the forum state to determine which substantive law governs the action." *Perez v. Fedex Ground Package Sys., Inc.*, 587 F. App'x 603, 606 (11th Cir. 2014). Florida courts "will enforce a choice-of-law provision in a contract unless the law of the chosen

forum contravenes strong public policy." *Id.* Here, the First and Second Notes Receivable, the Security Agreement, and the Guaranty include a choice-of-law provision selecting Florida law, which does not contravene Florida's public policy (D.E. 8-1 at 7; 8-2 at 9; 8-4 at 3; 8-5 at 4). Thus, Florida law governs Absen's claims. *Schein v. Ernst & Young, LLP*, 77 So. 3d 827, 830 n.2 (Fla. 4th DCA 2012).

The Complaint adequately states a claim for breach of the First and Second Notes Receivable (Counts I and II) and the Guaranty (Count III); and for enforcement of the Security Agreement (Count IV). An action for breach of a promissory note and a guaranty "is the same as a breach of contract action." *PNC Bank, N.A. v. Advantage Boat Repair, Inc.*, No. 6:13-cv-1703-JA-DAB, 2014 U.S. Dist. LEXIS 49903, at *8–9 (M.D. Fla. Mar. 19, 2014), adopted by 2014 U.S. Dist. LEXIS 50582 (M.D. Fla. Apr. 10, 2014). "A breach of contract claim under Florida law requires the existence of a contract, the breach of the contract, and damages resulting from the breach." *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1217 (11th Cir. 2018).

The first element is met because the Complaint alleges that LED Capital executed the First and Second Notes Receivable, and Dekeyzer executed the Guaranty (D.E. 8 at ¶¶ 10, 14, 15), and because the Complaint attaches those agreements (D.E. 8-1, 8-4, 8-5). *First Home*, 2017 U.S. Dist. LEXIS 195218, at *5–6. The second element is met because the Complaint alleges that LED Capital failed to make scheduled payments under the First and Second Notes Receivable, that Defendants failed to repay all outstanding amounts due after Absen accelerated the Notes and made written demand, and that all conditions precedent "have occurred, have been performed, or have been waived" (D.E. 8 at ¶¶ 20, 22, 24, 29). *Id.* The third element is met

because the Complaint alleges that Absen has suffered damages as a result of Defendants' breach (*id.* at ¶¶ 39, 48, 58). *Id.*

The Complaint also adequately states a claim to enforce the Security Agreement (Count IV). Under Florida law, "while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral," § 679.3011(1), Florida Statutes; "a registered organization organized under the law of a state is located in that state," § 679.3071(5), Florida Statutes; and an individual debtor is "located" in the state of their principal place of residence, 679.3071(2)(a), Florida Statutes. LED Capital is a New Jersey limited liability company and Dekeyzer's principal place of residence is New Jersey (D.E. 8 at ¶¶ 4–5). Thus, New Jersey law governs perfection of Absen's security interest in the subject collateral.

Under New Jersey law, "[t]he requirements for creation of a valid security interest are (1) a writing (2) signed by the debtor (3) describing collateral (4) and indicating that the debtor grants a security interest in the collateral to the creditor." *Leasing Serv. Corp. v. Am. Nat'l Bank & Trust Co.*, 1976 U.S. Dist. LEXIS 15430, at *16 (D.N.J. Apr. 23, 1976). Those requirements are met here. The loan documents are in writing; are signed by Dekeyzer as the sole member of LED Capital; describe collateral; and indicate that LED Capital granted a security interest in the collateral to Absen (D.E. 8-2; 8-5).

Pursuant to section 12A:9-108, New Jersey Statutes, "a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described." § 12A:9-108(a), N.J. Stat. "[A] description of collateral reasonably identifies the collateral if it identifies the collateral by: (1) specific listing; (2) category; (3) . . . a type of collateral defined in the Uniform Commercial Code; (4) quantity; (5) computational or allocational formula or

procedure; or (6) . . . any other method, if the identity of the collateral is objectively determinable." § 12A:9-108(b). This standard has been interpreted broadly. *See Merrill Lynch Bus. Fin. Servs. v. Kupperman,* 2010 U.S. Dist. LEXIS 52785 (D.N.J. May 27, 2010).

In *Kupperman*, the parties' security agreement described the collateral as follows:

> [T]he WCMA Account, all Accounts, Chattel Paper, Contract Rights, Inventory, Equipment, Fixtures, General Intangibles, Deposit Accounts, Documents, Instruments, Investment Property and Financial Assets of Customer, howsoever arising, whether now owned or existing or hereafter acquired or arising, and wherever located; together will all parts thereof (including spare parts), all accessories and accessions thereto, all books and records (including computer records) directly related thereto, all proceeds thereof (including, without limitation, proceeds in the form of Accounts and insurance proceeds), and the additional collateral described in Section 3.6(b) hereof.

*Id.* at *61. Despite including a general description of "Accounts, Chattel Paper, Contract Rights, Inventory, Equipment, Fixtures, General Intangibles, Deposit Accounts, Documents, Instruments, Investment Property and Financial Assets," the District of New Jersey held that the plaintiff's "designation of such collateral in the Security Agreement [was] permissible, and the Agreement [was] enforceable to its full scope." *Id.*

The loan documents at issue here include the following similar description of collateral:

> (A) "1,800 Absen M2.9 mobile LED tiles and 448 Absen X3v mobile LED tiles with control system and accessories packed in flight cases . . . together with all replacements therefor, additions and accessories thereto, and proceeds, whether now owned or hereafter acquired (including, but without limitation, insurance proceeds) and products thereof, including, without limitation, all Accounts; Chattel Paper; Commercial Tort Claims; Documents; General Intangibles; Instruments; Intellectual Property Rights; Investment Property; Payment Intangibles; Supporting Obligations arising from or related to the Equipment;"

> (B) "[t]he Membership Interests," which is defined as "the present and future membership interests (or other ownership or profit interests in) [LED Capital], all of the warrants, options or other

rights for the purchase or acquisition from [LED Capital] of membership interests (or other ownership or profit interest in) [LED Capital], all securities convertible into or exchangeable for membership interests (or other ownership or profit interests in) [LED Capital] or warrants, rights or options for the purchase or acquisition from [LED Capital] of such membership interests (or such other interests), and all of the other ownership or profit interests in [LED Capital] (including member or trust interests therein), whether voting or nonvonting, and whether or not such membership interests, warrants, options, rights or other interests are outstanding on any dates of determination, in each such case including all voting rights and economic rights related thereto;" and

(C) "[A]ll right, title and interest of [LED Capital] in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired: (i) 1,008 Viss VX5 Plus LED tiles featuring 5.7 mm pixel pitch, 60 cm by 120 cm frame size, and white SMD2727, with NovaStar control system and accessories . . . together with all replacements therefor, additions and accessions thereto; (ii) all accounts; chattel paper; general tangibles, goods, equipment, inventory payment intangibles and other assets of [LED Capital], whether no owned or hereafter acquired; and (iii) all proceeds (including, but without limitation, insurance proceeds) of any of the foregoing."

(D.E. 8-2 at 1 – 2, 7 – 9; 8-5 at 7, 13, Ex. B).  In addition, the documents even identify some of the collateral in an "Equipment List" (D.E. 8-5 at 7, 13, Ex. B).  Because the collateral is specifically listed, identified by category, or subject to objective determination, the description is legally sufficient.  § 12A:9-108(b); *Kupperman,* 2010 U.S. Dist. LEXIS 52785, at *61.

Pursuant to section 12A:9-108, New Jersey Statutes, "a financing statement must be filed to perfect all security interests."  § 12A:9-108, N.J. Stat.  Absen filed two UCC Financing Statements (Filing Numbers 52348756 and 52502271) with the State of New Jersey, Department of the Treasury, Division of Revenue & Enterprise Services, UCC Section (D.E. 8 at ¶¶ 13, 17; 8-3; 8-6), and thus, perfected its security interests.

**B.**     <u>Absen Is Entitled to Monetary Damages</u>

Turning to the issue of relief, Absen seeks monetary damages against the Defendants. An evidentiary hearing is not necessary because the damages here are "discernable from documentary evidence or affidavits." *PNC Bank*, 2014 U.S. Dist. LEXIS 49903, at *14. Because of LED Capital's default under the First and Second Notes Receivables, Absen is entitled to the outstanding principle and default interest of twelve percent (D.E. 8-1 at 2, 4–5; 8-5 at 2–3). LED Capital is responsible for damages in relation to both the First and Second Notes Receivable, but Dekeyzer only in relation to the First Note Receivable because of the terms of the Guaranty (D.E. 8-4 at 1).

There are two components of damages in this case: (1) outstanding principal on each note; and (2) 12% default interest calculated from February 20, 2019 through February 7, 2020. The first and second affidavits of Allen Lu, attached as **Exhibits B** and **C**, and the affidavit of Lingrong Zhang, attached as **Exhibit D**, explain in detail the factual bases for each component of damages (D.E. 17-1). Below we discuss: (A) outstanding principal; (B) default interest; and (C) a summary of damages.

**1.**     <u>Outstanding Principal</u>

The First and Second Notes Receivable included a payment schedule and required specific monthly payments. At the end of this subsection are two tables, taken from the second affidavit of Allen Lu, which present a detailed calculation of the principal outstanding under each note (Ex. C at ¶¶ 3–4). The table titled "August 3, 2017 Note" presents the payments owed and payments made in connection with the First Note Receivable; and the table titled "November 9, 2017 Note" presents the same information for the Second Note Receivable (*id.*). Each table includes two headings—"Principal Owed" and "Principal Paid"—and then two subheadings—

"Date" and "Amount"—under each heading (*id.* at ¶ 5). "Principal Owed" is a reproduction of each note's corresponding payment schedule (*id.*). "Principal Paid" lists the date and amount of each payment Absen received in connection with each note before their acceleration (*id.*). As demonstrated by the tables, the payments were sporadic and often significantly late. Although late charges of 5% of the scheduled payment were permitted (*see*, *e.g.*, D.E. 8-1 at 4; 8-5 at 1), none is sought by this action or this motion.

At the bottom are "Totals" of the "Amount" of "Principal Owed" and the "Amount" of "Principal Paid" (*id.* at ¶ 6). In addition, below the "Totals" is the "Total Outstanding Principal," which was calculated by subtracting the "Total" "Amount" of "Principal Paid" from the "Total" "Amount" of "Principal Owed" (*id.*). The "Total Outstanding Principal" is $2,470,173.27 for the August 3, 2017 Note; and $2,700,850.73 for the November 9, 2017 Note (*id.*).

There is a $5 discrepancy between the principal listed on the face of the August 3, 2017 Note ($3,746,810.00) and the principal calculated by adding up all amounts listed on the payment schedule ($3,746,815.00) (*id.* at ¶ 7). The $5 discrepancy occurred because of a rounding error (*id.*). In an abundance of caution, the extra $5 was excluded (*id.*).

| August 3, 2017 Note | | | |
|---|---|---|---|
| Principal Owed | | Principal Paid | |
| Date | Amount | Date | Amount |
| Aug-17 | $300,000.00 | 8/15/2017 | $260,000.00 |
| Jan-18 | $95,148.00 | 9/15/2017 | $40,000.00 |
| Feb-18 | $94,753.00 | 6/13/2018 | $573,752.68 |
| Mar-18 | $275,207.00 | 7/25/2018 | $50,000.00 |
| Apr-18 | $93,057.00 | 8/13/2018 | $140,000.00 |
| May-18 | $92,661.00 | 8/14/2018 | $187,889.05 |
| Jun-18 | $92,265.00 | 3/7/2019 | $25,000.00 |
| Jul-18 | $91,870.00 | | |
| Aug-18 | $91,474.00 | | |
| Sep-18 | $91,078.00 | | |
| Oct-18 | $90,682.00 | | |
| Nov-18 | $90,287.00 | | |

| Date | Amount | | |
|---|---|---|---|
| Dec-18 | $270,741.00 | | |
| Jan-19 | $88,591.00 | | |
| Feb-19 | $88,195.00 | | |
| Mar-19 | $87,799.00 | | |
| Apr-19 | $87,404.00 | | |
| May-19 | $267,858.00 | | |
| Jun-19 | $85,708.00 | | |
| Jul-19 | $85,312.00 | | |
| Aug-19 | $84,916.00 | | |
| Sep-19 | $84,521.00 | | |
| Oct-19 | $84,125.00 | | |
| Nov-19 | $83,729.00 | | |
| Dec-19 | $264,183.00 | | |
| Jan-20 | $82,033.00 | | |
| Feb-20 | $81,638.00 | | |
| Mar-20 | $262,092.00 | | |
| Apr-20 | $79,942.00 | | |
| May-20 | $79,546.00 | | |

**TOTALS**          **$3,746,815.00**          **$1,276,641.73**

**TOTAL AMOUNT OWED**          **$2,470,173.27**

| November 9, 2017 Note | | | |
|---|---|---|---|
| **Principal Owed** | | **Principal Paid** | |
| **Date** | **Amount** | **Date** | **Amount** |
| Apr-18 | $25,000.00 | 7/10/2018 | $25,000.00 |
| May-18 | $25,000.00 | 7/26/2018 | $20,000.00 |
| Jun-18 | $25,000.00 | 8/14/2018 | $37,149.27 |
| Jul-18 | $25,000.00 | 10/29/2018 | $42,000.00 |
| Aug-18 | $25,000.00 | 1/23/2019 | $50,000.00 |
| Sep-18 | $25,000.00 | 2/21/2019 | $30,000.00 |
| Oct-18 | $25,000.00 | | |
| Nov-18 | $35,000.00 | | |
| Dec-18 | $35,000.00 | | |
| Jan-19 | $75,000.00 | | |
| Feb-19 | $75,000.00 | | |
| Mar-19 | $75,000.00 | | |
| Apr-19 | $75,000.00 | | |
| May-19 | $75,000.00 | | |
| Jun-19 | $95,000.00 | | |
| Jul-19 | $95,000.00 | | |
| Aug-19 | $95,000.00 | | |

| | | | |
|---|---|---|---|
| Sep-19 | $95,000.00 | | |
| Oct-19 | $95,000.00 | | |
| Nov-19 | $95,000.00 | | |
| Dec-19 | $100,000.00 | | |
| Jan-20 | $100,000.00 | | |
| Feb-20 | $100,000.00 | | |
| Mar-20 | $100,000.00 | | |
| Apr-20 | $100,000.00 | | |
| May-20 | $100,000.00 | | |
| Jun-20 | $100,000.00 | | |
| Jul-20 | $100,000.00 | | |
| Aug-20 | $105,000.00 | | |
| Sep-20 | $105,000.00 | | |
| Oct-20 | $105,000.00 | | |
| Nov-20 | $105,000.00 | | |
| Dec-20 | $105,000.00 | | |
| Jan-21 | $105,000.00 | | |
| Feb-21 | $105,000.00 | | |
| Mar-21 | $105,000.00 | | |
| Apr-21 | $75,000.00 | | |
| **TOTALS** | **$2,905,000.00** | | **$204,149.27** |
| | | | |
| **TOTAL AMOUNT OWED** | **$2,700,850.73** | | |

### 2. **Default Interest**

Both notes include a provision for default interest, which is defined as "a variable per annum rate of interest equal to the lesser of (1) 12% per annum, or (2) the maximum rate allowed by applicable laws" (D.E. 8-1 at 2; 8-5 at 6). The maximum rate of interest permitted by Florida law is 18%. § 687.02, Fla. Stat. (2019). Thus, default interest of 12% per annum applies.

The default interest begins to accrue upon an event of default, which includes the failure to make a monthly payment that is not cured within five days of written notice, and it continues to accrue until the aggregate indebtedness is repaid in full (D.E. 8-1 at 4–5; 8-5 at 2–3). Here, the event of default occurred in September 2018, when Defendants stopped making payments on the notes (Ex. B at ¶ 11). In January 2019, Absen demanded, in writing and by certified mail,

that LED Capital cure the default and pay all outstanding amounts due (*id.* at ¶ 12). Although not required by the notes, Absen made a second demand on February 14, 2019 (*id.* at ¶ 13). The five-day cure period expired on February 20, 2019, without any payments or a response (*id.* at ¶¶ 14–15). To date, the aggregate indebtedness has not been repaid in full (Ex. C at ¶¶ 3–7).

At the end of this subsection are two tables, taken from the affidavit of Lingrong Zhang, which present a detailed calculation of the default interest that has accrued on each note (Ex. D at ¶ 5). The second affidavit of Allen Lu calculated default interest from February 20, 2019 (when the five-day cure period on the second demand expired) through December 6, 2019 (when the supplemental memorandum was due) (Ex. C at ¶ 8). The affidavit of Lingrong Zhang provides these calculations through February 7, 2020 (when this renewed motion is due) (Ex. D at ¶ 3).

In an abundance of caution, the default interest is not compounded in the calculations, even though compound interest may be permitted (Ex. C at ¶ 9; Ex. D at ¶ 5). The table titled "August 3, 2017 Note" presents the default interest that has accrued on the total principal sought in connection with the First Note Receivable; and the table titled "November 9, 2017 Note" presents the same information for the Second Note Receivable (Ex. C at ¶ 10; Ex. D at ¶ 5). There are several rows with titles along the left column of each table ("Daily Interest Rate," "Days," "Monthly Interest," "Principal Outstanding," and "Total Default Interest") and several columns with titles along the top row (e.g., "February 2019," "March 2019") (Ex. C at ¶ 11; Ex. D at ¶ 5). Each column is a calculation of how much default interest accrued on the month indicated (*id.*). The monthly interest is then added to determine total interest (*id.*)

"Principal Outstanding" is the total amount of principal sought in this lawsuit in connection with each note (Ex. C at ¶ 12; Ex. D at ¶ 4). "Daily Interest Rate" is the default interest rate of 12% per annum expressed per day (Ex. C at ¶ 13; Ex. D at ¶ 5). It was calculated

by dividing 12% (expressed as a decimal) by 365 and then expressing the result as a percentage after rounding down (0.032876%) (Ex. D at ¶ 5). "Days" is the number of days that default interest accrues in each corresponding month (Ex. D at ¶ 5). It is the total number of days in each month, except for "February 2019" and "February 2020" because default interest started and ended in those months and, thus, only accrued for part of those months (*id.*). "Monthly Interest" is how much default interest accrued each month (*id.*). For each column, it was calculated by multiplying "Daily Interest Rate" by "Principal Outstanding" and then by "Days" (*id.*). "Total Default Interest" was calculated by adding the amounts in each column for "Monthly Interest" (*id.*). It constitutes the total amount of default interest that has accrued on the principal outstanding for each note (*id.*). The "Total Default Interest" is $286,668.69 for the First Note Receivable; and $313,439.87 for the Second Note Receivable (Ex. D at ¶ 5).

**August 3, 2017 Note**

|  | Feb. 2019 | Mar. 2019 | Apr. 2019 | May-19 | Jun-19 | Jul-19 | Aug. 2019 |
|---|---|---|---|---|---|---|---|
| **Daily Interest Rate** | 0.032876% | 0.032876% | 0.032876% | 0.032876% | 0.032876% | 0.032876% | 0.032876% |
| **Days** | 9 | 31 | 30 | 31 | 30 | 31 | 31 |
| **Monthly Interest** | $7,308.83 | $25,174.87 | $24,362.78 | $25,174.87 | $24,362.78 | $25,174.87 | $25,174.87 |

|  | Sept. 2019 | Oct. 2019 | Nov. 2019 | Dec. 2019 | Jan. 2020 | Feb. 2020 |
|---|---|---|---|---|---|---|
| **Daily Interest Rate** | 0.032876% | 0.032876% | 0.032876% | 0.032876% | 0.032876% | 0.032876% |
| **Days** | 30 | 31 | 30 | 31 | 31 | 7 |
| **Monthly Interest** | $24,362.78 | $25,174.87 | $24,362.78 | $25,174.87 | $25,174.87 | $5,684.65 |

| **Principal Outstanding** | $2,470,168.27 |
|---|---|
| **Total Default Interest** | $286,668.69 |

**November 9, 2017 Note**

|  | Feb. 2019 | Mar. 2019 | Apr. 2019 | May-19 | Jun-19 | Jul-19 | Aug. 2019 |
|---|---|---|---|---|---|---|---|
| **Daily Interest Rate** | 0.032876% | 0.032876% | 0.032876% | 0.032876% | 0.032876% | 0.032876% | 0.032876% |
| **Days** | 9 | 31 | 30 | 31 | 30 | 31 | 31 |

| Monthly Interest | $7,991.39 | $27,525.88 | $26,637.95 | $27,525.88 | $26,637.95 | $27,525.88 | $27,525.88 |

|  | Sept. 2019 | Oct. 2019 | Nov. 2019 | Dec. 2019 | Jan. 2020 | Feb. 2020 |
|---|---|---|---|---|---|---|
| Daily Interest Rate | 0.032876% | 0.032876% | 0.032876% | 0.032876% | 0.032876% | 0.032876% |
| Days | 30 | 31 | 30 | 31 | 31 | 7 |
| Monthly Interest | $26,637.95 | $27,525.88 | $26,637.95 | $27,525.88 | $27,525.88 | $6,215.52 |

| Prinicipal Outstanding | $2,700,850.73 |
|---|---|
| Total Default Interest | $313,439.87 |

After default and acceleration of the notes, LED Capital made six payments to Absen: (1) $45,000 on May 9, 2019; (2) $90,000 on August 1, 2019; (3) $10,000 on August 2, 2019; (4) $50,000 on September 20, 2019; (5) $75,000 on October 31, 2019; and (6) $40,000 on December 4, 2019 (Ex. D at ¶ 10). These payments, which occurred well after default and acceleration, total $310,000 (*id.*). No other payment has been received (*id.*). Pursuant to the Guaranty, Absen is permitted to allocate these payments to whatever indebtedness it chooses (D.E. 8-4 at 1, 4). Absen chose to allocate these payments first to reduce the default interest owed on the First Note Receivable; and then to reduce the default interest owed on the Second Note Receivable (Ex. D at ¶ 11). Thus, $286,668.69 was allocated to reduce the default interest owed on the First Note Receivable to zero; and then the remainder ($23,331.31) was allocated to reduce the default interest owed on the Second Note Receivable to $290,108.56 (*id.*).

### 3. **Summary of Damages**

The following table summarizes the total damages sought from each Defendant:

| From LED Capital and Dekeyzer | |
|---|---|
| Outstanding principal on August 3, 2017 Note | $2,470,168.27 |
| Default Interest | $0.00 |
| **Total** | $2,470,168.27 |

| From LED Capital Only | |
|---|---|
| Outstanding principal on November 9, 2017 Note | $2,700,850.73 |
| Default Interest | $290,108.56 |
| **Total** | **$2,990,959.29** |

(Ex. D at ¶ 12).  Absen has established a sufficient factual bases for these damages and is entitled

to a judgment in these amounts.  *See Solis v. Buckholtz Traffic Eng'g, Inc.*, No. 3:11-cv-248-

MMH-MCR, 2012 U.S. Dist. LEXIS 183287, at *3 (M.D. Fla. Dec. 6, 2012) ("As Plaintiff has

established the amount of its damages through an affidavit . . . the Court is able to establish the

amount of the default judgment without the necessity for an evidentiary hearing.").

## II.    Absen's Name Should Be Corrected in the Default Judgment To Remove an Extraneous Comma

Absen requests that the default judgment be entered in favor of "Absen Inc."—instead of

"Absen, Inc."—to correct an extraneous comma included in the underlying agreements and the

Amended Complaint.   § 694.12, Fla. Stat. (2019) ("All deeds of conveyance, bills of sale,

mortgages, or other transfers of real or personal property within the limits of this state . . . in

which the name of said corporation shall be incorrectly set out . . . by omitting a word from the

corporate name, or by adding a word thereto, or by misspelling any part of the name of said

corporation, and the identity of said corporation shall plainly appear from the contents . . . shall

be taken and eemed valid and effectual as though the name of said corporation were correctly set

out . . . and the same shall, notwithstanding such irregularity or defect, be deemed and taken as

properly executed.").

"Slight departures from the name used by the corporation, such as the omission of a part

of its name or the inclusion of additional words, generally will not affect the validity of contracts

or other business transactions as long as the identity of the corporation can be reasonably

established from the note evidence." *Avant Capital, LLC v. Gomez*, 254 So. 3d 1042, 1044 (Fla.

Dist. Ct. App. 2018) (holding that promissory note was valid, even though it listed "Providian Mortgage of South Florida"—a nonexistent entity—as the lender, instead of "Providian Mortgage Corporation of South Florida"); *Textron Fin. Corp. v. RV Having Fun Yet, Inc.*, 2011 U.S. Dist. LEXIS 84673, Case No. 3:09-cv-2-J-34TEM, at *8 (M.D. Fla. Aug. 2, 2011) (entering default judgment against "RV Having Fun Yet Inc.," even though complaint listed "RV Having Fun Yet, Inc." as defendant); *Desoto Health & Rehab., LLC v. Phila. Indem. Ins. Co.*, 2010 U.S. Dist. LEXIS 149294, Case No. 2:09-CV-599-FtM-36SPC, at *3 (M.D. Fla. July 9, 2010) (holding that complaint "properly identified" defendant, even though it listed "Philadelphia Indennity [sic] Insurance Company" as the defendant, instead of "Philadelphia Indemnity Insurance Company d/b/a Philadelphia Insurance Companies").

## CONCLUSION

For these reasons, Absen requests that this Court grant Plaintiff's Renewed Motion for Default Judgment and enter a final default judgment in favor of Absen on all remaining counts in the Complaint (D.E. 8). The final default judgment should grant monetary damages in favor of "Absen Inc." and against LED Capital for $5,461,127.56, and against Marcel Dekeyzer for $2,470,168.27. In addition, the judgment should find that Absen has a perfected security interest in all of the collateral identified in the UCC Financing Statements 52348756 and 52502271.

Dated: February 14, 2020

**WHITE & CASE LLP**

By: */s/ Chris Swift-Perez*
James N. Robinson
Florida Bar No. 608858
Chris Swift-Perez (*trial counsel*)
Florida Bar No. 0100407
Cecilia Walker
Florida Bar No. 113434
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: jrobinson@whitecase.com
E-mail: cswift-perez@whitecase.com
E-mail: cwalker@whitecase.com

*Counsel for Plaintiff Absen, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 14, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that, on February 14, 2020, the foregoing document will be mailed via the United States Postal Service to LED Capital, LLC, whose last known address is 11 Melanie Lane, Suite 21, East Hanover, NJ, 07936; and to Marcel Dekeyzer, whose last known address is 64 Rolling Hills Driver, Chatham, NJ, 07928.

By: /s/ *Chris Swift-Perez*
Chris Swift-Perez